# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                             No. CR 15-4269 JB

DAVID CALBERT,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Sentencing Memorandum with Objections to Presentence Investigation Report, filed August 13, 2019 (Doc. 239)("Objections"). The primary issues are: (i) whether Defendant David Calbert's assault on Paul Silva with a deadly weapon was an attempt to commit first-degree murder such that § 2A2.1(a)(1) of the United States Sentencing Guidelines Manual (U.S. Sentencing Comm'n 2018)("U.S.S.G." or "Guidelines")[1] applies, establishing a base offense level of 33; (ii) whether

---

[1]The Supreme Court of the United States of America held in <u>Peugh v. United States</u>, 569 U.S. 530 (2013):

> District courts must begin their sentencing analysis with the Guidelines in effect at the time of the offense and use them to calculate the sentencing range correctly; and those Guidelines will anchor both the district court's discretion and the appellate review process in all of the ways we have described. The newer Guidelines, meanwhile, will have the status of one of many reasons a district court might give for *deviating* from the older Guidelines, a status that is simply not equivalent for *ex post facto* purposes.

569 U.S. at 549 (emphasis in original). The 2018 Guidelines Manual provides, however, that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced" unless doing so "would violate the *ex post facto* clause of the United States Constitution," in which case "the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(a)-(b)(1). Calbert conspired to murder Paul Silva and intentionally assaulted Silva with a dangerous weapon in March, 2011, <u>see</u> Indictment at 8-9, filed

Silva sustained permanent or life-threatening bodily injury as a result of the assault, warranting a 4-level enhancement under U.S.S.G. § 2A2.1(b)(1)(A); (iii) whether the assault "involved the offer or the receipt of anything of pecuniary value for undertaking the murder," U.S.S.G. § 2A2.1(b)(2), warranting the 4-level enhancement under U.S.S.G. § 2A2.1(b)(2); and (iv) whether Silva was physically restrained during the assault, warranting the 2-level enhancement under U.S.S.G. § 3A1.3. The Court held a sentencing hearing on August 16, 2019. The Court notes that Calbert based his Objections on the original Presentence Investigation Report, filed February 11, 2019 (Doc. 219)("Original PSR"). The United States Probation Office ("USPO") has subsequently provided a revised Presentence Investigation Report, filed August 9, 2019 (Doc. 235)("Revised PSR"), which removes the 4-level enhancement under U.S.S.G. § 2A2.1(b)(2) from its offense-level calculation, because "it was determined the offense was not committed for pecuniary gain." Revised PSR at 1.[2] The offense-level calculation has not otherwise changed. Compare Original PSR at 10-11 with Revised PSR at 11-12. The Court will base its Guidelines calculation analysis on the Revised PSR. Accordingly, the Court concludes that: (i) Calbert's assault on Silva with a deadly weapon constitutes an attempt to commit first-degree murder, so the Court overrules Calbert's Objection to the application of U.S.S.G. § 2A2.1(a)(1); (ii) Silva sustained a life-threatening bodily injury from the assault, so the Court

---

December 1, 2015 (Doc. 2), so the 2010 Guidelines Manual, effective November 1, 2010, would apply to both offenses if the Court does not use the current Guidelines Manual, see U.S.S.G. § 1B1.11(b)(3). Using the 2010 Guidelines Manual does not change the result here. See U.S.S.G. § 1B1.11(b)(1). Accordingly, the Court uses the 2018 Guidelines Manual.

[2]When citing to the Revised PSR, the Court cites to the page number at the top of the document, which are provided when the document was filed with the electronic filing system, and not the page numbers at the bottom of the document, which the document itself provides.

overrules Calbert's Objection to the application of U.S.S.G. § 2A2.1(b)(1)(A); (iii) because the Revised PSR did not apply U.S.S.G. § 2A2.1(b)(2) and the assault was not committed for pecuniary gain, Calbert's Objection to its application is moot and the Court overrules it; and (iv) Silva was physically restrained in the course of the assault, so the Court overrules Calbert's Objection to the application of U.S.S.G. § 3A1.3.

On September 28, 2017, Calbert pled guilty to Count 1 of the Indictment, filed December 1, 2015 (Doc. 2) -- conspiracy to murder in violation of 18 U.S.C. § 1959(a)(5); and Count 2 -- assault with a dangerous weapon in violation of 18 U.S.C. § 1959(a)(3). <u>See</u> Plea Agreement at 2, filed September 28, 2017 (Doc. 153); Indictment at 8-9. In the Plea Agreement, Calbert admits the following facts and declares them true under penalty of perjury:

> In 1998, while incarcerated in the New Mexico Department of Corrections, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture/distribute narcotics. The SNM operates in the District of New Mexico and elsewhere. The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

> In March 2011, I conspired with SNM member Mauricio Varela, to kill . . . [Silva]. This conspiracy led to Mauricio Varela and I assaulting [Silva], while we were incarcerated at the Penitentiary of New Mexico, in Santa Fe, New Mexico. I stabbed him with a "shank" (a dangerous weapon) which resulted in serious bodily injury. I committed the assault and conspired to kill [Silva]. by virtue of my membership in the SNM and in order to maintain or increase my status in the SNM.

> We did this because it was expected of us by virtue of our membership in the SNM and to maintain or increase our positions in the SNM.

Plea Agreement at 5. By signing the Plea Agreement, Calbert "agrees that the Court may rely on any of these facts, as well as facts in the presentence report, to determine the defendant's sentence, including, but not limited to, the advisory guideline offense level." Plea Agreement at 5-6.

The Revised PSR expounds on the facts underlying the assault, which are unchanged from the Original PSR -- with the exception of a clause stating that, because Calbert admitted to committing the assault to maintain or increase his status in the SNM, a 4-level increase under U.S.S.G. § 2A2.1(b)(2) is warranted, which the Revised PSR has removed. Compare Original PSR ¶¶ 23-31, at 7-9, with Revised PSR ¶¶ 23-31, at 8-10. The Revised PSR provides the following facts:

> 23. According to New Mexico State Police (NMSP) reports, on March 14, 2011, an officer responded to the Penitentiary of New Mexico (PNM) in Santa Fe, New Mexico, in reference to an inmate on inmate assault. Upon arrival, the NMSP officer met with correctional officers (CO), who stated a fight erupted among three inmates in the recreational area of Yard B, resulting in one inmate, identified in the Indictment as P.S., sustaining serious injuries from a series of stab wounds. The COs stated P.S. was transported to an outside hospital. The two other inmates involved in the assault, Mauricio Varela, also known as "Archie" and "Hog Nuts," and **David Calbert, also known as "Spider,"** were isolated and housed in separate areas pending interviews.
>
> 24. The NMSP officer interviewed the COs, who were present at the time of the assault. One of the COs stated he observed **Calbert** in what appeared to be a stabbing motion directed at P.S. The CO observed the white part of an object, later identified as the handle of the "shank," in **Calbert's** hand during a series of eight single-arm thrusts toward P.S. The CO also stated Varela was hitting and holding P.S. during the attack. The CO stated the assault lasted approximately 3 to 5 minutes when a blast ball was thrown onto the courtyard by the CO. The CO then observed **Calbert** walk over to the fence and throw the "shank" into another yard. The CO continued to use gas and other resources to gain control of the situation.
>
> 25. The NMSP officer then interviewed another CO, who indicated he had transported a group of six inmates from housing to the recreational yard before the assault. Prior to exiting the housing unit, all inmates were strip searched and placed in a metal detector designed for the entire body. The CO admitted the metal detector was known not to work properly; however, the CO still ran inmates

through the metal detector, as it was procedure. Upon the completion of the search and use of the metal detector, the CO escorted all inmates to the recreational yard. The CO did not note anything outside the norm of the everyday routine with the inmates. After allowing the inmates to enter the yard, the CO locked the gate and, thereafter, noticed a fight in progress at the bottom of the stairs by the wall ball court approximately 30 feet away from the CO's view. The CO stated he observed **Calbert** and Varela attacking P.S. The CO stated P.S. was attempting to fight back during the attack. The CO then immediately radioed the control room, and shortly thereafter, gas was thrown into the yard. The CO then observed **Calbert** throw an object over the fence. Eventually, COs took control of the yard and transported P.S. to the hospital.

26.     The NMSP officer then examined the area where the assault occurred and noted that upon entry into the wall ball court, there were visible shoe markings consistent with a fight, three areas of blood, and P.S.'s shirt in the furthermost left corner of the wall ball court. The NMSP officer also located the "shank" in a separate yard, just north of the wall ball court. The "shank" was approximately 5 inches in length and approximately ¾ of an inch in width with a sharpened tip. The "shank" appeared to be a metal strand with grey paint, while the handle was wrapped in a white cloth.

27.     The NMSP officer made contact **Calbert**, who stated he did not want to comment on the matter, and the interview was concluded. The NMSP officer also contacted Varela, who related he too did not want to comment on the matter.

28.     Prison officials later learned through video surveillance and follow-up interviews that soon after the inmates entered the yard, Varela and **Calbert** attacked P.S. P.S. began fighting back and knocked Varela to the ground. The fight then moved to the wall ball court, where P.S. again knocked Varela to the ground. As Varela fell, he grabbed P.S.'s shirt and dragged him to the ground with him. **Calbert** and Varela then gained the advantage. Varela got back to his feet, and as **Calbert** was stabbing P.S., Varela proceeded to kick P.S. in the head. As CO staff deployed chemical weapons, the attack stopped, and **Calbert** was observed throwing the "shank" into the adjacent yard. Varela was observed pacing back and forth in front of P.S., as P.S. swayed on his feet, bleeding profusely. P.S. was reported to have looked at Varela and asked, "Why? Why?" Varela did not answer. Others on the yard indicated P.S.'s breathing created an audible gurgling sound from his side as he continued to bleed. P.S. then fell over and was removed from the yard on a stretcher. As P.S. was being removed from the yard, CO staff confirmed **Calbert** looked over at him and stated in a sarcastic tone, "Hope you make it, Sexy."

29.     Later, the NMSP officer contacted P.S. at the hospital; however, he refused to comment on the incident. While at the hospital, the NMSP officer was informed

P.S. suffered 10 stab wounds, mainly on the front and back of his torso. Medical staff related P.S. was expected to recover from his wounds.

30. According to prison officials, P.S., **Calbert**, and Varela are members of the SNM prison gang. The NMSP officer gleaned from prison staff that P.S. had stabbed another SNM member at a prison in Las Cruces, New Mexico, in 2008. Prison staff speculated P.S. was stabbed in retaliation for the 2008 stabbing. The prison staff further indicated P.S. had recently attempted to become a leader in the SNM and may have caused anger and jealousy with other SNM members, which may have also attributed to the assault and stabbing. Additional correctional records relate Varela was known to "hold the keys" at the South PNM Level V facility, and nothing could happen without his approval. Neither Varela nor **Calbert** made any statements regarding a plan or prior discussions about their intent to assault P.S.

31. In summary, Varela, a known SNM leader at the South PNM Level V facility, and **Calbert**, another SNM member, assaulted P.S. with a dangerous weapon with intent to commit murder. As such the base offense level is 33 pursuant to USSG §2A2.1(a)(1). Varela struck P.S. and then held him down, while **Calbert** stabbed him 10 times on the front and back of his torso. P.S. suffered severe blood loss and had difficulty breathing, which required medical intervention at an outside hospital due to the substantial risk of death. Based on this information, a four-level increase is warranted, pursuant to §2A2.1(b)(1)(A), and a two-level increase is warranted, pursuant to §3A1.3. Varela and **Calbert** later admitted they committed the assault on P.S. by virtue of their membership in the SNM and in order to maintain or increase their status in the SNM. Based on available information, Varela and **Calbert** were members of the SNM, who participated in unlawful activities under the direction of others. However, there is not enough information to accurately assess the defendant's role, pursuant to §3B1.1 or §3B1.2.

Revised PSR ¶¶ 23-31, at 8-10 (bold in original). Calbert does not object to the Revised PSR's recitation of facts. See Objections at 1-25.

Calbert agrees that the USPO correctly uses U.S.S.G. § 2A2.1, pursuant to U.S.S.G. § 2E1.3, to calculate the base offense level. See Objections at 7. He objects, however, to the USPO's characterization of his assault on Silva as one that "would have constituted first degree murder" under U.S.S.G. § 2A2.1(a)(1) and argues that Silva's assault falls under the "otherwise" category, which U.S.S.G. § 2A2.1(a)(2) provides. Calbert argues that the assault would not have

constituted felony murder and "was not a premeditated killing." Objections at 7. He maintains that he "was armed in the event something happened," and that "[b]eing prepared to defend yourself with a knife in prison from someone you have been arguing with and being threatened by, is factually inconsistent with the requirements for 18 U.S.C. § 1111." Objections at 9-10.

An Application Note for U.S.S.G. § 2A2.1 defines first-degree murder as "conduct that, if committed within the special maritime and territorial jurisdiction of the United States, would constitute first-degree murder under 18 U.S.C. § 1111." U.S.S.G. § 2A2.1 Application Note 1. The pertinent part of 18 U.S.C. § 1111 provides:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.
>
> Any other murder is murder in the second degree.

18 U.S.C. § 1111(a). The Court agrees with Calbert that the assault was not "committed in the perpetration of, or attempt to perpetrate," any of the enumerated offenses, and therefore the Court focuses on whether the assault would have constituted a premeditated killing, with malice aforethought. 18 U.S.C. § 1111(a). See Objections at 7. Killing "with malice aforethought" means "to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life." Tenth Circuit Pattern Jury Instructions Criminal No. 2.52, at 165 (2018). "[T]he use of a weapon or instrument, and the manner in which death was caused" may be considered in determining if "the killing was with malice aforethought." Tenth Circuit Pattern

Jury Instructions Criminal § 2.52, at 165. "[E]vidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm" may establish malice aforethought. United States v. Wood, 207 F.3d 1222, 1228 (10th Cir. 2000)(internal quotation marks omitted)(quoting United States v. Soundingsides, 820 F.2d 1232, 1237 (10th Cir. 1987)). Premeditation "is the result of planning or deliberation"; it must be enough time "for the killer, after forming the intent to kill, to be fully conscious of that intent." Tenth Circuit Pattern Jury Instructions Criminal No. 2.52, at 165.

The Court concludes that a preponderance of the evidence establishes that Calbert acted with malice aforethought. Calbert stated in his plea allocution that, because of his issues with Silva, he acquired a knife and, although he did not plan or intend to kill Silva, he stabbed Silva in an argument and knew that "[the killing] could . . . happen." Change of Plea at 18:16 (taken September 29, 2017)(Calbert), filed October 31, 2017 (Doc. 181)("Plea Tr."). See Objections at 8 (quoting Plea Tr. at 18:3-17 (Calbert)). At the change of plea hearing, the Honorable Gregory B. Wormuth, United States Magistrate Judge for the United States District of New Mexico, noted that the United States alleges that Calbert conspired with Varela to kill Silva, and questioned Calbert about this agreement. See Plea Tr. at 18:18-23 (Court). Calbert explained that Varela "just knew that something might happen," and that "I was going to do something, and I knew he was going to get in it if something happened." Plea Tr. at 18:24-25 (Calbert); id. at 19:2-3 (Calbert). Calbert said that Varela had left his knife inside, because Varela knew Calbert was armed with a knife "[t]o defend [himself]." Plea Tr. at 19:18 (Calbert). See id. at 19:8-16 (Calbert, Court). Calbert agreed with Judge Wormuth that he had, before the assault, arranged for Varela

to provide him with back up, and that he knew that his first stab in Silva's neck would very likely lead to Silva's death if he struck well. See Plea Tr. at 21:16-22:4 (Court, Calbert). A correctional officer who witnessed the assault saw Calbert thrust the knife toward Silva eight times, and medical staff indicated that Silva suffered ten stab wounds "mainly in the front and back of his torso." Revised PSR ¶ 29, at 9. See id. ¶ 24, at 8. Other witnesses of the assault stated that Silva's "breathing created an audible gurgling sound from his side as he continued to bleed" and that he was "bleeding profusely." Revised PSR ¶ 28, at 9. Calbert's stabbing Silva ten times with a handmade knife or a shank, combined with his knowledge that stabbing Silva in the neck could lead to profuse bleeding and Silva's death, establishes that Calbert acted with malice aforethought. See United States v. Wood, 207 F.3d at 1228 (quoting United States v. Soundingsides, 820 F.2d at 1237); Tenth Circuit Pattern Jury Instructions Criminal No. 2.52, at 165.

The Court also concludes by a preponderance of the evidence that Calbert acted with premeditation. Calbert maintains that he did not intend to murder Silva and brought the knife to defend himself should anything occur, because he did not know whether Silva was armed. See Plea Tr. at 18:5-17 (Calbert). Calbert initiated the fight, however, by stabbing Silva in the neck. See Plea Tr. at 18:7-9 (Calbert); id. at 21:20-25 (Court, Calbert). He proceeded to stab Silva another nine times. See Revised PSR ¶ 28, at 9. This conduct undermines Calbert's assertion that the knife was for self-defense, as there is no indication that Silva acted in a way to lead Calbert to "reasonably believe[] that he [was] in imminent danger of death or great bodily harm." United States v. Toledo, 739 F.3d 562, 567 (10th Cir. 2014)(citing United States v. Visinaiz, 428 F.3d 1300, 1311 (10th Cir. 2005). See United States v. Greschner, 802 F.2d 373, 384 (10th Cir. 1986)). Calbert knew that, if he struck well with the knife, aiming for the neck was "very likely to lead to

[Silva's] death." Plea Tr. at 22:2-3 (Court). See id. at 22:4 (Calbert). Calbert's attorney explained at the plea hearing that "it's important that [Calbert] get it on the record that it was not his intent, nor did he plan in advance, it was not premeditated," because it "goes to the Guidelines analysis." Plea Tr. at 22:6-8 (Baker). The Court, however, has viewed the video of the assault and listened to Calbert describe the incident. Calbert testified that he stabbed Silva, because they were having disagreements and Silva became disrespectful, so Calbert finally stabbed him. See Transcript of Excerpted Testimony of David Calbert at 27:111-16 (taken February 2 & 5, 2018)(Beck, Calbert), filed April 4, 2018, in United States v. DeLeon, No. CR 15-4268 (Doc. 2056)("DeLeon Tr."). Calbert explained that Silva was trying to run the pod and that Calbert disagreed with his leadership. See DeLeon Tr. at 27:23-28:17 (Beck, Calbert). He admitted to attacking Silva in the recreation yard with Varela and stabbing Silva many times. See DeLeon Tr. at 53:16-22 (Duncan, Calbert). These facts gathered from Calbert's trial testimony and the video of the assault, combined with Calbert's admission that he knew that stabbing Silva in the neck was likely to lead to his death, precludes the Court from crediting Calbert's statement that he did not intend or plan to kill Silva. The Court therefore concludes by a preponderance of the evidence that Calbert acted with premeditation. Because Calbert acted with premeditation and malice aforethought, U.S.S.G. § 2A2.1(a)(1) applies, and Calbert's base offense level will remain at 33. The Court overrules Calbert's Objection.

Calbert next objects to the 4-level enhancement that the USPO applies under U.S.S.G. § 2A2.1(b)(1)(A) for Silva's injuries from the assault. See Objections at 11. Calbert asserts that Silva did not suffer permanent or life-threatening injuries as U.S.S.G. § 2A2.1(b)(1)(A)'s application requires. See Objections at 11. Instead, Calbert maintains that Silva sustained serious

bodily injury, so only a 2-level enhancement should apply under U.S.S.G. § 2A2.1(b)(1)(B). See Objections at 11.

U.S.S.G. § 2A2.1(b)(1) provides: "If (A) the victim sustained permanent or life-threatening bodily injury, increase by **4** levels; (B) the victim sustained serious bodily injury, increase by **2** levels; or (C) the degree of injury is between that specified in subdivisions (A) and (B), increase by **3** levels." U.S.S.G. § 2A2.1(b)(1) (bold in original). An Application Note to U.S.S.G. § 2A2.1 notes that U.S.S.G. § 1B1.1's Application Note 1 defines the terms "permanent or life-threatening bodily injury" and "serious bodily injury." This Application Note provides the following definitions:

> (K) "***Permanent or life-threatening bodily injury***" means injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent. In the case of a kidnapping, for example, maltreatment to a life-threatening degree (*e.g.*, by denial of food or medical care) would constitute life-threatening bodily injury.
>
> . . . .
>
> (M) "***Serious bodily injury***" means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. In addition, "serious bodily injury" is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law.

U.S.S.G. § 1B1.1 Application Note 1(K), (M). In an unpublished opinion, the United States Court of Appeals for the Tenth Circuit concludes that "whether an injury is life threatening must be

viewed at the time of the injury." United States v. Whitehorn, 141 F.3d 1186, 1998 WL 165167, at *2 (10th Cir. 1998)(unpublished table opinion).[3]

There is no evidence before the Court indicating that Silva suffered permanent injury from the assault; accordingly, the Court will focus on whether the injury crosses the threshold from serious bodily injury to life-threatening bodily injury. Calbert states in his Plea Agreement that he stabbed Silva "with a 'shank' (a dangerous weapon) which resulted in serious bodily injury." Plea Agreement at 5. Accordingly, at the minimum, the 2-level enhancement under U.S.S.G. § 2A2.1(b)(1)(B) applies. The Court has the authority and ability to calculate the Guidelines correctly, and the Court may find, by a preponderance of the evidence, that the injury is more severe. See United States v. Sangiovanni, No. CR 10-3239, 2014 WL 4347131, at *23 (D.N.M. Aug. 29, 2014)(Browning, J)(quoting United States v. Limon, 566 F. App'x 723, 726 (10th Cir. 2014)(unpublished)). The USPO asserts that the 4-level enhancement under U.S.S.G. § 2A2.1(b)(1)(A) applies, because Calbert stabbed Silva ten times, and Silva "suffered severe blood loss and had difficulty breathing, which required medical intervention at an outside hospital due to the substantial risk of death." Revised PSR ¶ 31, at 10. The USPO does not provide the factual basis on which it concludes that Silva faced a "substantial risk of death." Revised PSR

---

[3]United States v. Whitehorn is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that United States v. Whitehorn, 141 F.3d 1186, 1998 WL 165167 (10th Cir. 1998)(unpublished table opinion), has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

¶ 31, at 10. The Revised PSR provides that Silva was stabbed ten times, mainly in his torso, was bleeding profusely, that his breathing created a gurgling sound as he bled, that he fell over, and that medical staff at the hospital where Silva was treated relayed to a police officer that Silva was expected to recover. See Revised PSR ¶¶ 28-29, at 9. The plea hearing revealed that Calbert first stabbed Silva in the neck. See Plea Tr. at 21:10-12 (Castellano). The brief video of the assault shows Silva covered in blood, sitting in a pool of his blood, unable to stand. Calbert asserts that Silva returned to the prison within a week of being admitted to the hospital and that the "hospital records do not indicate that he faced a substantial risk of death." Objections at 11. The United States provided extensive medical records at the sentencing hearing, however, that do not support Calbert's position. The medical records state that Silva's stab wounds were "bleeding liberally" and that he had lost "quite a bit of blood at the scene." Christus St. Vincent Emergency Documentation at 17, filed August 28, 2019 (Doc. 250)("Medical Records"). The Medical Records describe that Silva's breathing was labored, and that he was short of breath and disoriented, but still able to answer questions. See Medical Records at 17. A doctor inserted a chest tube because of air and blood in the chest cavity. See Medical Records at 21. The multiple stab wounds, blood loss, and medical records support the Court's conclusion, by a preponderance of the evidence, that the assault put him at substantial risk of death and, therefore, that he suffered life-threatening bodily injury. Accordingly, the Court overrules Calbert's Objection and applies U.S.S.G. § 2A2.1(b)(1)(A).

Finally, Calbert objects to U.S.S.G. § 3A1.3, asserting that the evidence does not support the enhancement. See Objections at 14. He asserts that video evidence of the assault does not support the Revised PSR's version of events, namely that "Varela struck P.S. and then held him

down while **Calbert** stabbed him."  Revised PSR ¶ 31, at 10 (bold in original).  <u>See</u> Objections at 14.  Calbert maintains that "Silva was not held down or restrained in any manner."  <u>See</u> Objections at 14.

U.S.S.G. § 3A1.3 applies where the "victim was physically restrained in the course of the offense."  U.S.S.G. § 3A1.3.  The Guidelines Manual counsels that the restraint-of-victim enhancement does not apply "where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself."  U.S.S.G. § 3A1.3 Application Note 2.  The Guidelines Manual defines the term "physically restrained" as "the forcible restraint of the victim such as being tied, bound, or locked up." U.S.S.G. § 1B1.1 Application Note 1(L).  These examples "are merely illustrative and not exhaustive."  <u>United States v. Rodella</u>, No. CR 14-2783, 2015 WL 711941, at *27 (D.N.M. Feb. 5, 2015)(Browning, J.)(citing <u>United States v. Checora</u>, 175 F.3d 782, 790 (10th Cir. 1999)).  The Tenth Circuit has advised that the restraint-of-victim enhancement applies where "there [is] a forcible restraint of a victim which occurs during commission of the offense."  <u>United States v. Checora</u>, 175 F.3d at 790 (footnote omitted).

The Court agrees that the video does not show any restraint of Silva.  The video is, however, only of the end of the assault; it does not capture the entire assault.  The Revised PSR provides that a correctional officer saw Varela holding Silva during the attack.  <u>See</u> Revised PSR ¶ 24, at 7.  Further, interviews reveal that, when Silva knocked Varela to the ground, Varela grabbed Silva's shirt and pulled down Silva.  <u>See</u> Revised PSR ¶ 28, at 9.  Both these actions facilitated Calbert's stabbing Silva and are restraint sufficient for U.S.S.G. § 3A1.3 to apply.  <u>See</u> <u>United States v. Ivory</u>, 532 F.3d 1095, 1106 (10th Cir. 2008)(upholding the enhancement's application where the

defendant took an action meant to "trap or immobilize" the victim); United States v. Checora, 175 F.3d at 790 (applying the enhancement where the defendants tackled the victim to the ground to prevent his escape).  The Court accordingly overrules Calbert's Objection and applies U.S.S.G. § 3A1.3.

**IT IS ORDERED** that all of the objections in the Defendant's Sentencing Memorandum with Objections to Presentence Investigation Report, filed August 13, 2019 (Doc. 239), are overruled.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

    _Attorneys for the Plaintiff_

Sarah M. Gorman
Law Offices of Robert D. Gorman
Albuquerque, New Mexico

    _Attorney for Defendant Angel DeLeon_

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

*Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

*Attorneys for Defendant Edward Troup*

Russell Dean Clark
Las Cruces, New Mexico

*Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

*Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

*Attorney for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

--and--

Joseph E. Shattuck
Marco & Shattuck
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

*Attorneys for Defendant Allen Patterson*

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Eduardo Solis
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

*Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, LLC
Denver, Colorado

--and--

Noel Orquiz
Deming, New Mexico

*Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

*Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

*Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

--and--

León Encinias
León Felipe Encinias Attorney at Law
Albuquerque, New Mexico

*Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

*Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

*Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

*Attorneys for Defendant Mario Rodriguez*

Jacqueline K. Walsh
Walsh & Larranaga
Seattle, Washington

--and--

Ray Velarde
El Paso, Texas

*Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

*Attorneys for Defendant Mauricio Varela*

Richard Jewkes
El Paso, Texas

--and--

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

*Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Brusuelas-Benavidez
Albuquerque, New Mexico

*Attorneys for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

*Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

      *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm, LLC
Las Cruces, New Mexico

      *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

      *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

      *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

--and--

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C.
Corrales, New Mexico

*Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

*Attorneys for Defendant Rudy Perez*

Lisa Torraco
Albuquerque, New Mexico

--and--

Donavon A. Roberts
Albuquerque, New Mexico

*Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

*Attorney for Defendant Santos Gonzalez*

Angela Arellanes
Albuquerque, New Mexico

*Attorney for Defendant Shauna Gutierrez*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

*Attorney for Defendant Brandy Rodriguez*